U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

DEC 1 3 2005

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| RAWLEIGH MILLER | CIVIL ACTION NO. 05-0393-M |
| VS. | SECTION P |
| BURL CAIN, WARDEN | JUDGE JAMES |
| | MAGISTRATE JUDGE KIRK |

## REPORT RECOMMENDING DISMISSAL OF SOME BUT NOT ALL OF PETITIONER'S *HABEAS CORPUS* CLAIMS

Before the court is the petition for writ of *habeas corpus* (28 U.S.C. §2254) filed on March 3, 2005 by *pro se* petitioner Rawleigh Miller. Petitioner is an inmate in the custody of Louisiana's Department of Public Safety and Corrections. He is incarcerated at the Louisiana State Penitentiary, Angola, where he is serving concurrent sentences of life and fifty years imposed in September, 2000 following his conviction on charges of second degree murder and attempted second degree murder in the Fourth Judicial District Court, Ouachita Parish.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court.

### STATEMENT OF THE CASE

The petition [Doc. 1], its accompanying memorandum [Doc. 1, Memorandum] and exhibits [Doc. 5, Exhibits] and the presumptively reliable published jurisprudence of the United States Supreme Court and the State of Louisiana establish the following:

1. Petitioner was indicted by the Ouachita Parish Grand Jury and charged with one count of first degree murder and one count of attempted first degree murder. Prior to trial the charges

were amended to second degree murder and attempted second degree murder. [Doc. 1, Memorandum, p. 4]

2. Petitioner was found guilty as charged and sentenced to concurrent sentences of life and fifty years.[1] [*id.*, pp. 4-5]

3. Petitioner did not file a timely motion for appeal. On some unspecified date he filed a pleading which resulted in the court granting him an out-of-time appeal. [*id.*, p. 5; see also Doc. 5, Exhibits, Exhibit 1 at p. 3]

4. Petitioner's court appointed appeal attorney filed petitioner's brief on appeal on January 22, 2002. [*id.*] Petitioner argued three assignments of error: (1) insufficiency of the evidence; (2) error by the trial court when it permitted the erroneous admission of other crimes evidence; and (3) error by the trial court when it failed to grant petitioner's motion to suppress an inculpatory statement. [Doc. 5, Exhibit 1]

Petitioner's conviction was affirmed on July 25, 2002. See *State v. Miller*, 36,003 (La. App. 2d Cir. 7/25/2002), 824 So.2d 1208. [See also, Slip Opinion, Doc. 5, Exhibit 2]

5. On August 19, 2002 petitioner applied for writs of *Certiorari* and/or Review in the Louisiana Supreme Court. [Doc. 5, Exhibit 3]

On June 27, 2003 petitioner's writ application was denied. *State v. Miller*, 2002-2480 (La. 6/27/2003), 847 So.2d 1253. [See also, Doc. 5, Exhibit 4] Petitioner did not seek further review in the United States Supreme Court. [Doc. 7]

---

[1] Petitioner claims that he was convicted on September 1, 2000. [Doc. 1, paragraph 2] He does not specify the date he was sentenced. However, the writ application filing sheet provided with petitioner's Supreme Court writ application indicates that sentencing was on October 30, 2000. [Doc. 5, Exhibit 3, p. i]

6. On September 4, 2003 petitioner filed an Application for Post-Conviction Relief in the Fourth Judicial District Court. The application raised two claims: (1) "...a racially discriminatory system of selecting the Ouachita Grand Jury Forepersons violated his rights pursuant to the 5th, 6th, and 14th Amendments...", and (2) ineffective assistance of counsel. As to the latter claim, petitioner argued three specific claims of ineffective assistance of counsel – (a) Counsel failed to amend the "not guilty and not guilty by reason of insanity" plea; (b) Counsel failed to challenge the discriminatory practice of appointment grand jury foreperson; (c) Counsel failed to file a motion to quash based upon disproportionate under representation of Blacks on the Ouachita Parish Grand and Petit Juries. [Doc. 5, Exhibit 5]

The petition was summarily denied on September 9, 2003.[2] [Doc. 1, Memorandum, pp. 5- 6; Doc. 5, Exhibit 6]

7. On September 29, 2003 petitioner applied for writs in Louisiana's Second Circuit Court of Appeals under Docket Number KH- 03- 8241. [Doc. 5, Exhibit 7]

That court denied writs on October 30, 2003 and sent notice of judgment to petitioner on that same date.[3] [Doc. 5, Exhibit 8]

8. On November 14, 2003 petitioner applied for writs in the Louisiana Supreme Court under that court's docket number 2003-KH-3293. [Doc. 5, Exhibit 9] The court denied writs on

---

[2] The trial court ruled that petitioner's grand jury claims were "not timely argued."

[3] In denying petitioner's grand jury claim, the court citing *Deloch v. Whitley*, 96-1901 (La. 11/22/96), 684 So.2d 349, noted, "'All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state's procedural requirements. Any equal protection claim that is not asserted in a pre-trial motion to quash is waived.' The applicant indicates in his application that a pre-trial motion to quash the indictment was not filed on his behalf. Therefore, the trial court was correct when it determined that the applicant has waived his right to make this claim." [Doc. 5, Exhibit 8]

January 7, 2005. [Doc. 5, Exhibit 10; see also *State ex rel. Miller v. State*, 2003-3293 (La. 1/7/2005), 891 So.2d 672.

9. Petitioner's federal *habeas corpus* petition was signed on February 28, 2005 and received and filed on March 3, 2005. Petitioner argues claims identical to those raised on direct appeal and in his application for post-conviction relief:

Claim One, insufficiency of the evidence, was argued on direct appeal. Claim Two, erroneous introduction of "other crimes evidence" was also argued on direct appeal. Claim Three, the failure of the trial court to suppress petitioner's confession, was also argued on direct appeal. Claim Four, racially discriminatory manner of selecting the grand jury foreperson, was argued throughout petitioner's post-conviction proceedings. Claim Five, ineffective assistance of counsel based on (a) counsel's failure to withdraw the "not guilty and not guilty by reason of insanity" plea prior to trial; and (b) counsel's failure to timely file a Motion to Quash based upon the grand jury selection process were also argued throughout petitioner's post conviction proceedings.

## LAW AND ANALYSIS

1. Procedural Default – Claim 4 (Grand Jury Foreperson Selection)

The procedural default doctrine bars federal *habeas corpus* review when a state court declines to address a petitioner's federal claims because the petitioner has failed to follow a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991). "[I]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas* review of the claims is barred unless the prisoner can demonstrate cause for the default and actual

prejudice as result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750-51. This doctrine ensures that federal courts give proper respect to state procedural rules. *Id.*

Furthermore, the doctrine presumes that a state court's express reliance on a procedural bar functions as an independent and adequate ground in support of the judgment. *Sones v. Hargettt*, 61 F.3d 410, 416 (5th Cir. 1996). However, a petitioner can rebut this presumption by establishing that the procedural rule is not strictly or regularly followed. *Moore v. Roberts*, 83 F.3d 699 (5th Cir. 1996). The burden in on the petitioner to show that a state did not strictly and regularly follow the procedural bar at the time pertinent to his state court action. *Stokes v. Anderson*, 123 F.3d 840, 843 (5th Cir. 1999); *Amos v. Scott*, 61 F.3d 333, 342, (5th Cir. 1995); *Sones*, 61 F.3d at 416. In bearing the burden, the petitioner must demonstrate that the state failed to apply the procedural bar to claims which are identical or similar to the claims raised by him. *Stokes*, 123 F.3d at 860; *Amos*, 61 F.3d at 340.

The Fourth Judicial District Court dismissed petitioner's grand jury claim because it "...was not timely argued..." [Exhibit 6]

The Second Circuit Court of Appeals dismissed petitioner's grand jury claims as procedurally defaulted stating,

> "Any objections arising from the selection of grand jury foreperson are treated as ones alleging discriminatory selection of grand jurors. *Campbell v. Louisiana*, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.23d 551 (1998).
>
> 'All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state's procedural requirements.' *Deloch v. Whitley*, 96-1901 (La. 11/22/96), 684 So.2d 349. Any equal protection claim that is not

asserted in a pre-trial motion to quash is waived. *id.*

The applicant indicates in his application that a pre-trial motion to quash the indictment was not filed on his behalf. Therefore, the trial court was correct when it determined that the applicant has waived the right to make this claim." See *State of Louisiana v. Rawleigh Miller*, 38241-KH (La. App. 3d Cir. 10/30/2003) at Exhibit 8]

Under Louisiana law, a challenge to the legality of the grand jury venire must be made by a pretrial motion to quash. La.C.Cr.P. art. 533 provides (in relevant part): "A motion to quash an indictment by a grand jury may also be based on one or more of the following grounds: (1) The manner of selection of the general venire, the grand jury venire, or the grand jury was illegal." Art. 521 provides (in relevant part): "Pretrial motions shall be made or filed within fifteen days after arraignment [unless other provisions of law or the court allows otherwise for good cause]." Art. 535 provides (in relevant part): "A motion to quash on grounds other than those stated in Paragraphs A and B of this Article [which do not include challenges to the grand jury] shall be filed in accordance with Article 521... The grounds for a motion to quash under Paragraphs B and C are waived unless a motion to quash is filed in conformity with those provisions."

The United States Fifth Circuit Court of Appeals has recognized that a state court's dismissal of a post-conviction claim based upon the above cited statutes, provides an "adequate and independent" state law ground prohibiting federal *habeas* review unless the federal *habeas* petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the violation of federal law. *Williams v. Cain*, 125 F.3d 269, 276 (5th Cir. 1997).[4]

---

[4] "It is undisputed that Williams never filed a pretrial motion to quash, let alone a timely motion. Williams raised his claim based on the selection of the grand jury foreman for the first time during his state post-conviction proceedings. Therefore, under Louisiana law his claim is

When a state prisoner has defaulted on his federal claims in the state courts pursuant to an independent and adequate state procedural rule, he can avoid the bar of procedural default only if he can show (1) a miscarriage of justice exists (i.e. actual innocence), *Gray v. Netherland*, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), or (2) "cause for the noncompliance" with state law and "actual prejudice resulting from the alleged constitutional violation." *Coleman*, 501 U.S. at 750 (*quoting, Wainwright v. Sykes*, 433 U.S. 74, 84, 97 S.Ct 2497, 2505, 53 L.Ed. 2d 594 (1972)).

In order for a *habeas* petitioner to avoid a procedural bar by showing a fundamental miscarriage of justice, the petitioner must assert his actual innocence by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 478. *Corwin v. Johnson* 150 F.3d 467, 473 (5th Cir. 1998); *Glover v. Cain*, 128 F.3d 900, 904 (5th Cir. 1997); *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995). To support such an exception, the petitioner must allege that as a factual matter he did not commit the crime of which he has been convicted. *Corwin*, 150 F.3d at 473; *Ward*, 53 F.3d at 108.

Furthermore, in order for a *habeas* petitioner to avoid procedural bar by showing cause and prejudice, the petitioner must show that "some objective factor external to the defense" prevented the petitioner from properly raising the claim in state court. *McClesky v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)(quoting, *Murray*, 477 U.S. at 488).

A defendant may show "cause" by proving ineffective assistance of counsel in violation of the Sixth Amendment of the Constitution. See *Murray v. Carrier*, 477 U.S. 478, 488, 106

---

procedurally barred. *Deloch v. Whitley*, 684 So.2d 349, 350 (La.1996) (holding equal protection claim based upon discriminatory selection of grand jury foreman procedurally barred by defendant's failure to file a pretrial motion to quash)." *Williams v. Cain*, 125 F.3d 269 at 275.

S.Ct. 2639, 91 L.Ed.2d 397 (1986). But petitioner is reminded, "In addition to cause, [he] must show actual prejudice to overcome the procedural bar." *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir.1996) (internal quotations omitted). "The movant makes this showing where he demonstrates that, <u>but for</u> the error, he might not have been convicted." *Id.* See *Pickney v. Cain*, 347 F.3d 542, 545 (5th Cir. 2003).

Further, petitioner is reminded that in order to show that a failure to consider these claims will result in a "fundamental miscarriage of justice" he must show, "... as a factual matter, that he did not commit the crime of conviction." *Fairman v. Anderson*, 188 F.3d 635 (5th Cir.1999) (citing *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir.1995). To establish such actual innocence, petitioner must "support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

Ordinarily, upon identifying a procedurally defaulted claim, a petitioner would be directed to amend her pleadings to show that the procedural default is not appropriate by showing "cause and prejudice" or a "miscarriage of justice."

Petitioner does not offer any argument concerning his actual innocence; nor has provided any "...new, reliable evidence that was not presented at trial ... [which demonstrates] that it was 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Fairman v. Anderson, supra.*

Petitioner does argue cause and prejudice, however. In a separate claim for relief he argues that the cause for the default of his grand jury claim was the ineffective assistance of his

trial attorney. However, even if it is assumed that the complained of inaction of counsel amounts to sufficient "cause" petitioner cannot show prejudice.

Here, the evidence of petitioner's guilt was overwhelming.[5] A jury was convinced of his

---

[5] The following statement of the case by the Second Circuit Court of Appeals leaves little doubt but that overwhelming evidence of petitioner's guilt was presented at trail:

"Willie Ann Martin ('Martin') and the defendant were involved in a romantic relationship for five years. The relationship ended in January 1998. During their relationship, the defendant and Martin resided together at Eden Apartments in Bastrop, Louisiana with Martin's two daughters. On the night of February 22, 1998, Martin and a friend, Louise Rose ('Rose'), went to the Playpen, a nightclub, where they bought two quarts of beer. Martin and Rose consumed the beer while sitting in a car in the parking lot of the Townhouse, a neighboring club. While Martin and Rose were sitting in the car, the defendant drove up and asked Martin if she would give him a copy of her children's birth certificates so that he could claim them as dependents on his income tax return. The defendant had a passenger in the car, a woman, later identified only as 'Jennifer,' who the defendant was dating.

At approximately 11:30 p.m., Martin and Rose returned to Martin's apartment complex. Martin picked up Brittany, her eight-year-old daughter, from a neighbor who had been babysitting her. Martin then went to her apartment, started watching a movie and fell asleep on the sofa. At some time later, Rose awakened Martin and told her that someone was knocking at the door. After the defendant identified himself, Martin opened the door. The defendant entered the apartment and asked for the birth certificates. As Martin was going upstairs to her bedroom to get the birth certificates, she heard Rose say, 'Ouch.' Martin returned to the living room where she saw the defendant 'hitting' Rose, while Rose was seated on the loveseat. Martin called to Brittany, who had come out of her bedroom. When Brittany would not come to her, Martin ran out of the kitchen door for help.

According to Martin, the defendant followed her out of the door. Martin knocked on several of her neighbor's doors without success. When Martin approached the front door of Lacordia Jones' ('Jones') apartment, the defendant started 'hitting' Martin on the neck. Martin did not realize that the defendant was stabbing her until she saw the blood. The defendant stabbed Martin in the neck, stomach, arm, and chest. After the defendant left, Martin fell to the ground and started crawling and knocking on other doors for help.

Jones heard Martin knocking on her door and calling her name. Although Jones did not see Martin when she opened her door, she saw the defendant standing across from her apartment building. Jones testified that when she called the defendant's name, he ran away. Jones saw blood on her door and on the surrounding concrete.

At trial, the defendant testified that on the night of the crimes, he took Jennifer home, talked with some friends in a nightclub parking lot and then went to Martin's apartment. Before he arrived at Martin's apartment, he saw a kitchen knife with a brown handle lying on the ground and picked it up. When Martin let him into the apartment, he asked for the birth certificates. Martin asked the defendant why he had the knife in his possession. Martin then went toward her bedroom, but she came back out. According to the defendant, Martin stated that he 'should have carried [his] bitch's children on the tax thing.'

The defendant testified that Martin slapped him and started cursing at him in a loud voice. According to the defendant, he had the knife in his left hand when Martin slapped him. When Martin attempted to slap him again, he pushed her back. Rose grabbed the defendant's hand. Martin got up and continued hitting the defendant. The defendant testified that he did not know whether Martin or Rose had a weapon, but he saw something silver or shiny. During the incident, the defendant's hand and thumb were cut. The defendant testified that he could not remember stabbing anyone; however, he stated that he believed he was fighting for his life.

The defendant further testified that after the fight, Martin went out of the apartment through the kitchen door and he followed her. The defendant did not know what Rose was doing when he left. He testified that he saw Lacordia, but that he did not go to her apartment. According to the defendant, he wiped the blood from his hand onto his shirt, and he then placed the shirt and the knife near a wooded trail. The defendant testified that he went to his car and sat in his car wondering about the incident. According to the defendant, he was surprised when Martin slapped him. He testified that he did not have any hostility or anger toward Rose. The defendant also testified that he did not know how Rose was stabbed. He denied having any knowledge of the fact that Martin was hurt and Rose was killed.

Cherri Kyles ('Kyles') testified that she saw the defendant standing by a tree at the Eden Apartments at approximately 1:30 a.m. Kyles further testified that she found out about the incident at approximately 2:00 a.m.

Lashondra Jenkins ('Jenkins') testified that at approximately 3:00 a.m., she heard Martin at her door. Jenkins opened the door and Martin fell onto the floor. Jenkins testified that Martin was bloody from her head to her toes. Jenkins's mother applied towels to Martin's neck, which was gushing blood, while they waited for medical assistance. Jenkins testified that Martin did not have anything in her hand, she was wearing a gown and she did not have on any shoes.
James Lee Wallace, then an officer with the Bastrop Police Department, responded to the call that there was a possible stabbing at the Eden Apartments. He testified that he observed a vehicle leaving Eden Drive from the direction of the apartments. Officer Wallace arrived at the Jenkins' apartment and found Martin on the floor in a pool of blood. Martin told Officer Wallace that the defendant had attacked her and that her daughter was still in the apartment. When Officer Wallace arrived at Martin's apartment, he observed bloody footprints on the kitchen floor. Brittany was standing in the living room. Brittany told the officer that the defendant and her

mother were fighting. Officer Wallace testified that Brittany did not say that she saw a knife. As the officer and Brittany left the apartment, Brittany alerted the officer to Rose's body, which was lying in the parking lot. Rose was face down on the ground between her car and Martin's car. Officer Wallace observed a laceration on Rose's neck. Officer Wallace checked Rose for vital signs and concluded that she was dead.

Brittany did not testify at the defendant's trial. However, her stipulated testimony was given to the jury. According to Brittany, she saw the defendant with a knife that had a brown handle. The knife was from her home, but it was not a kitchen knife.

Detective Mike Tubbs of the Bastrop Police Department arrived at the crime scene shortly after the victims had been taken away. Detective Tubbs testified that he found blood on the two cars in the parking lot and a pool of blood at the rear of the vehicles. He further testified that there was a trail of blood from the apartment to the car. According to Detective Tubbs, Rose's watch was found on the ground on the right side of the front door of Martin's apartment and Rose's keys were found under the front door. Detective Tubbs testified that the car Officer Wallace observed leaving the apartment complex was registered to the defendant's mother.

Martin was admitted to the hospital on the night of the incident and was a patient for seven days. She testified that it took her a month to recover. Dr. JoAnne Alley, the general surgeon supervising Martin's surgeries, testified that Martin had stab wounds on both sides of her neck. She testified that Martin's internal jugular vein, the vein which brings blood from the brain to the heart, was completely transected and her carotid artery was cut. Dr. Alley opined that those injuries were life-threatening.

A jury trial commenced on August 28, 2000. The defendant's trial testimony was consistent with his earlier recorded statement. According to the defendant, the entire incident occurred at Martin's front door. He testified that he believed Martin must have had a knife because his right hand and little finger were cut. He denied that he was upset about the children's birth certificates. The police located the defendant's shirt in a wooded trail near the apartment complex. Linda Armstrong, an expert in DNA extraction, testing, analysis and interpretation, testified that the shirt contained blood from the defendant and both victims. Detective Tubbs testified that he searched for the knife described by the defendant for at least two days, but it was not recovered. Dr. Stephen Hayne, an expert in forensic pathology, performed an autopsy on Rose. Dr. Hayne testified that the cause of death was two slash wounds and two stab wounds, producing extensive internal and external bleeding. Dr. Hayne further testified that Rose had small scratches on her face, a bruise on her lower lip, scraping of the skin and abrasions on her elbow and knee. Dr. Hayne testified that those injuries were consistent with running and falling on a hard surface and sliding a small distance. Rose also had ten stab wounds and four slash wounds. Four of the ten stab wounds were located on Rose's back, and one of those four was lethal. Dr. Hayne indicated that one of the non-lethal stab wounds to the victim's back indicated movement of the victim or the assailant. Dr. Hayne explained that the lethal stab wound to the back pierced the victim's left

guilt beyond a reasonable doubt. Had petitioner's trial counsel filed a timely Motion to Quash, the District Attorney could have reconvened another grand jury and indicted the petitioner. Compare *Pickney v. Cain,* 337 F.3d 542, 545 (5th Cir. 2003)("We need not address whether Pickney has made a showing of 'cause' because we are confident that he has not been prejudiced. *United States v. Shaid*, 937 F.2d 228, 234 (5th Cir.1991). After reviewing the trial record, we have no doubt that, if Pickney had been successful in having his indictment quashed, the State of Louisiana would have sought and obtained a second indictment. ... Given the strength of the State's case, a successful grand jury challenge would have served no purpose other than to delay

---

lung causing considerable blood loss. Of the six remaining stab wounds, four were in the victim's chest, one was in her left forearm and one was in the right flank, which is part of the chest wall. The lethal wound to the chest went through the victim's heart and left lung. The stab wound on the victim's left forearm went entirely through the arm and was accompanied by a slash wound. Dr. Hayne classified the wounds on Rose's forearm as defensive posturing injuries. Dr. Hayne further testified that Rose had three slash wounds to the face, including a lethal slash wound which cut her right jugular vein and vocal chords. In addition, Dr. Hayne observed a gaping slash wound over the upper left chest wall near the collarbone. This wound was lethal because it cut two major vessels allowing considerable loss of blood. Dr. Hayne testified that this slash wound was unusual because of the tremendous force it would take to produce the wound's depth and length of 6.25 inches. Dr. Hayne further testified that the slash wound was not consistent with the victim holding the knife and cutting herself.

Dr. Hayne opined that a sharp-edged instrument with a blade of at least 4.5 inches in length and .75 inches in width could have been used to cause the injuries. He testified that the weapon would be consistent with a folding hunting knife. Dr. Hayne further testified that the depths of the wounds ranged from 1 inch to 3.25 inches. Dr. Hayne stated that he did not know how deep the stab wound to Rose's forearm could have gone because that stab wound went entirely through the forearm.

After viewing photographs of the defendant's injuries, Dr. Hayne testified that the small cuts were consistent with injuries suffered by an assailant. Dr. Hayne also testified that the injuries could be defensive posturing injuries, but that it would be unusual for Rose's injuries to be self-inflicted assailant wounds." *State v. Miller,* 824 So.2d 1208 at 1210-1214.

the trial. Accordingly, Pickney has failed to prove actual prejudice.")

Since petitioner has not shown that a miscarriage of justice will result if the court declines to address his procedurally defaulted grand jury claim, and, since even if he can show "cause" for the default, he clearly cannot show "prejudice" his Grand Jury claim (Claim Four) should be denied and dismissed as procedurally defaulted.

2. Claim II – Ineffective Assistance of Counsel (failed to quash Grand Jury) (Claim 5(b))

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts provides for prompt review and examination of *habeas* petitions by the court and further states, "If it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the petitioner to be notified." Citing *Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970), the Advisory Committee Notes following Rule 4 state, "...under § 2243 it is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer."

With respect to 5(b), petitioner argues that he was deprived of effective assistance of counsel when counsel failed to timely file a Motion to Quash based on the discriminatory grand jury selection process.[6]

Again, petitioner cannot demonstrate prejudice. Had counsel filed a timely motion, the State would have surely reconvened a Grand Jury and re-indicted the petitioner. Compare

---

[6] As noted elsewhere by petitioner, in order to prevail on an ineffective assistance of counsel claim, a federal habeas petitioner must show not only deficient performance, but also prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The habeas petitioner makes this showing when he demonstrates that, but for the error, he might not have been convicted.

*Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003).

In short, Claim 4 should be dismissed as procedurally defaulted. Claim 5(b) should be dismissed in accordance with Rule 4 inasmuch as the pleadings themselves establish that petitioner is not entitled to relief.

### 3. Remaining Claims

Petitioner's remaining claims – Claims 1, 2, 3 and 5(a) – appear to have been fully exhausted. These claims appear to be timely filed and were not the subject of a procedural default in the Louisiana Courts. Accordingly, a separate memorandum order has been prepared directing service of these claims on the respondents.

Accordingly,

**IT IS RECOMMENDED** that **Claim 4** (Racial Discrimination in the Selection of Grand Jury Foreperson) of the instant petition for *habeas corpus* be **DENIED AND DISMISSED WITH PREJUDICE** as procedurally defaulted;

**IT IS FURTHER RECOMMENDED** that **Claim 5(b)** (Ineffective Assistance of Counsel) of the instant petition for *habeas corpus* be **DENIED AND DISMISSED WITH PREJUDICE** pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts since it plainly appears from the face of the petition and exhibits annexed to it that the petitioner is not entitled to relief;

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy of any

objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See, Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers at Alexandria, Louisiana, this 13th day of December, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE