U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

OCT 18 2006

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| RAWLEIGH MILLER, <br>       Petitioner | CIVIL ACTION <br> SECTION "P" <br> No. CV05-0393-A |
| VERSUS | |
| BURL CAIN, WARDEN, <br>       Respondent | JUDGE ROBERT G. JAMES <br> MAGISTRATE JUDGE JAMES D. KIRK |

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by pro se petitioner Rawleigh Miller ("Miller") on March 3, 2005. Miller is contesting his 2000 convictions and sentences, pursuant to a jury trial in the Fourth Judicial District Court, Ouachita Parish, Louisiana, for second degree murder and attempted second degree murder. Miller was sentenced to life imprisonment plus fifty years.

The following grounds for habeas relief remain before the court[1]:

> 1. The evidence submitted at trial was insufficient to support the verdicts of guilty of second degree murder and attempted second degree murder in violation of the Fourteenth Amendment.
>
> 2. The trial judge erred in allowing the introduction of other crimes evidence in violation of the Fourteenth Amendment.

---

[1] The other grounds for relief have been dismissed (Doc. Item 17).

3. The trial judge erred in failing to suppress Miller's inculpatory statement in violation of the Fourteenth Amendment.

5a. Defense counsel was ineffective when he filed a motion to amend Miller's plea from not guilty to "no guilty by reason of insanity," then (1) after the sanity hearing counsel failed to change the plea back to not guilty, and (2) during trial counsel failed to present insanity evidence.

5c. Defense counsel was ineffective in failing to file a motion to quash the indictment due to the disproportionate under-representation of Black people on the Ouachita Parish Grand and Petit juries.

<u>Facts</u>

The facts of this case as set forth by the Louisiana Second Circuit Court of Appeal at <u>State v. Miller</u>, 36,003 (La. App. wd Cir. 7/25/02), 824 So.2d 1208, writ den., 2002-2480 (La. 6/27/03), 847 So.2d 1253, as follows:

"Willie Ann Martin ("Martin") and the defendant were involved in a romantic relationship for five years. The relationship ended in January 1998. During their relationship, the defendant and Martin resided together at Eden Apartments in Bastrop, Louisiana with Martin's two daughters.

"On the night of February 22, 1998, Martin and a friend, Louise Rose ('Rose'), went to the Playpen, a nightclub, where they bought two quarts of beer. Martin and Rose consumed the beer while sitting in a car in the parking lot of the Townhouse, a neighboring club. While Martin and Rose were sitting in the car, the defendant drove up and asked Martin if she would give him a copy of her children's birth certificates so that he could claim them as dependents on his income tax return. The defendant had a passenger in the car, a woman, later identified only as 'Jennifer,' who the defendant was dating.

"At approximately 11:30 p.m., Martin and Rose returned to Martin's apartment complex. Martin picked up Brittany, her eight-year-old daughter, from a neighbor who had been

babysitting her. Martin then went to her apartment, started watching a movie and fell asleep on the sofa. At some time later, Rose awakened Martin and told her that someone was knocking at the door. After the defendant identified himself, Martin opened the door. The defendant entered the apartment and asked for the birth certificates. As Martin was going upstairs to her bedroom to get the birth certificates, she heard Rose say, 'Ouch.' Martin returned to the living room where she saw the defendant 'hitting' Rose, while Rose was seated on the loveseat. Martin called to Brittany, who had come out of her bedroom. When Brittany would not come to her, Martin ran out of the kitchen door for help.

"According to Martin, the defendant followed her out of the door. Martin knocked on several of her neighbor's doors without success. When Martin approached the front door of Lacordia Jones' ('Jones') apartment, the defendant started 'hitting' Martin on the neck. Martin did not realize that the defendant was stabbing her until she saw the blood. The defendant stabbed Martin in the neck, stomach, arm, and chest. After the defendant left, Martin fell to the ground and started crawling and knocking on other doors for help.

"Jones heard Martin knocking on her door and calling her name. Although Jones did not see Martin when she opened her door, she saw the defendant standing across from her apartment building. Jones testified that when she called the defendant's name, he ran away. Jones saw blood on her door and on the surrounding concrete.

"At trial, the defendant testified that on the night of the crimes, he took Jennifer home, talked with some friends in a nightclub parking lot and then went to Martin's apartment. Before he arrived at Martin's apartment, he saw a kitchen knife with a brown handle lying on the ground and picked it up. When Martin let him into the apartment, he asked for the birth certificates. Martin asked the defendant why he had the knife in his possession. Martin then went toward her bedroom, but she came back out. According to the defendant, Martin stated that he 'should have carried [his] bitch's children on the tax thing.'

"The defendant testified that Martin slapped him and started cursing at him in a loud voice. According to the defendant, he had the knife in his left hand when Martin

3

slapped him. When Martin attempted to slap him again, he pushed her back. Rose grabbed the defendant's hand. Martin got up and continued hitting the defendant. The defendant testified that he did not know whether Martin or Rose had a weapon, but he saw something silver or shiny. During the incident, the defendant's hand and thumb were cut. The defendant testified that he could not remember stabbing anyone; however, he stated that he believed he was fighting for his life.

"The defendant further testified that after the fight, Martin went out of the apartment through the kitchen door and he followed her. The defendant did not know what Rose was doing when he left. He testified that he saw Lacordia, but that he did not go to her apartment. According to the defendant, he wiped the blood from his hand onto his shirt, and he then placed the shirt and the knife near a wooded trail. The defendant testified that he went to his car and sat in his car wondering about the incident. According to the defendant, he was surprised when Martin slapped him. He testified that he did not have any hostility or anger toward Rose. The defendant also testified that he did not know how Rose was stabbed. He denied having any knowledge of the fact that Martin was hurt and Rose was killed.

"Cherri Kyles ('Kyles') testified that she saw the defendant standing by a tree at the Eden Apartments at approximately 1:30 a.m. Kyles further testified that she found out about the incident at approximately 2:00 a.m.

"Lashondra Jenkins ('Jenkins') testified that at approximately 3:00 a.m., she heard Martin at her door. Jenkins opened the door and Martin fell onto the floor. Jenkins testified that Martin was bloody from her head to her toes. Jenkins's mother applied towels to Martin's neck, which was gushing blood, while they waited for medical assistance. Jenkins testified that Martin did not have anything in her hand, she was wearing a gown and she did not have on any shoes.

"James Lee Wallace, then an officer with the Bastrop Police Department, responded to the call that there was a possible stabbing at the Eden Apartments. He testified that he observed a vehicle leaving Eden Drive from the direction of the apartments. Officer Wallace arrived at the Jenkins' apartment and found Martin on the floor in a pool of blood. Martin told Officer Wallace that the

4

defendant had attacked her and that her daughter was still in the apartment. When Officer Wallace arrived at Martin's apartment, he observed bloody footprints on the kitchen floor. Brittany was standing in the living room. Brittany told the officer that the defendant and her mother were fighting. Officer Wallace testified that Brittany did not say that she saw a knife. As the officer and Brittany left the apartment, Brittany alerted the officer to Rose's body, which was lying in the parking lot. Rose was face down on the ground between her car and Martin's car. Officer Wallace observed a laceration on Rose's neck. Officer Wallace checked Rose for vital signs and concluded that she was dead.

"Brittany did not testify at the defendant's trial. However, her stipulated testimony was given to the jury. According to Brittany, she saw the defendant with a knife that had a brown handle. The knife was from her home, but it was not a kitchen knife.

"Detective Mike Tubbs of the Bastrop Police Department arrived at the crime scene shortly after the victims had been taken away. Detective Tubbs testified that he found blood on the two cars in the parking lot and a pool of blood at the rear of the vehicles. He further testified that there was a trail of blood from the apartment to the car. According to Detective Tubbs, Rose's watch was found on the ground on the right side of the front door of Martin's apartment and Rose's keys were found under the front door. Detective Tubbs testified that the car Officer Wallace observed leaving the apartment complex was registered to the defendant's mother.

"Martin was admitted to the hospital on the night of the incident and was a patient for seven days. She testified that it took her a month to recover. Dr. JoAnne Alley, the general surgeon supervising Martin's surgeries, testified that Martin had stab wounds on both sides of her neck. She testified that Martin's internal jugular vein, the vein which brings blood from the brain to the heart, was completely transected and her carotid artery was cut. Dr. Alley opined that those injuries were life-threatening.

"A jury trial commenced on August 28, 2000. The defendant's trial testimony was consistent with his earlier recorded statement. According to the defendant, the entire incident occurred at Martin's front door. He

testified that he believed Martin must have had a knife because his right hand and little finger were cut. He denied that he was upset about the children's birth certificates.

"The police located the defendant's shirt in a wooded trail near the apartment complex. Linda Armstrong, an expert in DNA extraction, testing, analysis and interpretation, testified that the shirt contained blood from the defendant and both victims. Detective Tubbs testified that he searched for the knife described by the defendant for at least two days, but it was not recovered.

"Dr. Stephen Hayne, an expert in forensic pathology, performed an autopsy on Rose. Dr. Hayne testified that the cause of death was two slash wounds and two stab wounds, producing extensive internal and external bleeding. Dr. Hayne further testified that Rose had small scratches on her face, a bruise on her lower lip, scraping of the skin and abrasions on her elbow and knee. Dr. Hayne testified that those injuries were consistent with running and falling on a hard surface and sliding a small distance. Rose also had ten stab wounds and four slash wounds. Four of the ten stab wounds were located on Rose's back, and one of those four was lethal. Dr. Hayne indicated that one of the non-lethal stab wounds to the victim's back indicated movement of the victim or the assailant. Dr. Hayne explained that the lethal stab wound to the back pierced the victim's left lung causing considerable blood loss. Of the six remaining stab wounds, four were in the victim's chest, one was in her left forearm and one was in the right flank, which is part of the chest wall. The lethal wound to the chest went through the victim's heart and left lung. The stab wound on the victim's left forearm went entirely through the arm and was accompanied by a slash wound. Dr. Hayne classified the wounds on Rose's forearm as defensive posturing injuries.

"Dr. Hayne further testified that Rose had three slash wounds to the face, including a lethal slash wound which cut her right jugular vein and vocal chords. In addition, Dr. Hayne observed a gaping slash wound over the upper left chest wall near the collarbone. This wound was lethal because it cut two major vessels allowing considerable loss of blood. Dr. Hayne testified that this slash wound was unusual because of the tremendous force

6

it would take to produce the wound's depth and length of 6.25 inches. Dr. Hayne further testified that the slash wound was not consistent with the victim holding the knife and cutting herself.

"Dr. Hayne opined that a sharp-edged instrument with a blade of at least 4.5 inches in length and .75 inches in width could have been used to cause the injuries. He testified that the weapon would be consistent with a folding hunting knife. Dr. Hayne further testified that the depths of the wounds ranged from 1 inch to 3.25 inches. Dr. Hayne stated that he did not know how deep the stab wound to Rose's forearm could have gone because that stab wound went entirely through the forearm.

"After viewing photographs of the defendant's injuries, Dr. Hayne testified that the small cuts were consistent with injuries suffered by an assailant. Dr. Hayne also testified that the injuries could be defensive posturing injuries, but that it would be unusual for Rose's injuries to be self-inflicted assailant wounds."

## Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

## Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation

of the Constitution or laws or treaties of the United States.  28
U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to
habeas petitions filed after its effective date on April 24, 1996,
habeas relief is not available to a state prisoner with respect to
a claim that was adjudicated on the merits in the State court
proceedings unless the adjudication of the claim (1) resulted in a
decision that was *contrary to*, or involved an *unreasonable*
*application of*, clearly established Federal law as determined by
the Supreme Court of the United States; or (2) resulted in a
decision that was based on an *unreasonable determination* of the
facts in light of the evidence presented in the State Court
proceeding.  Therefore, pure questions of law and mixed questions
of law and fact are reviewed under Section 2254 (d)(1), and
questions of fact are reviewed under Section 2254(d)(2).  <u>Martin v.</u>
<u>Cain</u>, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S.
885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established
Supreme Court precedent if the state court applies a rule that
contradicts the governing law set forth in Supreme Court cases, or
confronts a set of facts that are materially indistinguishable from
a decision of the Supreme Court and nevertheless arrives at a
result different from Supreme Court precedent.  A state court
decision falls within the "unreasonable application" clause when it

unreasonably applies Supreme Court precedent to the facts. <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

Law and Analysis

<u>Ground No. 1 - Sufficiency of the Evidence</u>

Miller contends the evidence submitted at trial was insufficient to support the verdicts of guilty of second degree murder and attempted second degree murder, in violation of the Fourteenth Amendment. Miller contends the State failed to carry its burden of proving he had the specific intent to kill Martin or Rose, and further contends he killed them in self defense. Alternatively, Miller contends convictions for manslaughter and attempted manslaughter would have been more appropriate.

A reviewing court confronted with a claim of insufficient evidence must, after viewing all the evidence in the light most favorable to the conviction (prosecution), determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Cupit v. Whitley</u>, 28 F.2d

9

532, 542 (5th Cir. 1994), cert. den., 513 U.S. 1163, 115 S.Ct. 1128, 130 L.Ed.2d 1091 (1995), citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781 (1979).

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. <u>West v. Johnson</u>, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing <u>Jackson v. Virginia</u>, 443 U.S. at 322-26, 99 S.Ct. at 2791-92. To apply this standard, the court looks to elements of the offense as defined by state substantive law. <u>Donahue v. Cain</u>, 231 F.3d 1000, 1004 (5th Cir. 2001).

A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence is entitled to a great deal of deference by a reviewing court. <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433-35, 103 S.Ct. 843, 850-51 (1983). In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight. <u>Jackson</u>, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15.

La. R.S. 14:30.1 defines second degree murder, in relevant part, as follows:

> A. Second degree murder is the killing of a human being:
> (1) When the offender has a specific intent to kill or to inflict great bodily harm;

10

<u>State v. Allen</u>, 2003-2156 (La.App. 4 Cir. 5/19/04), 876 So.2d 122, 127, writ den., 2004-1704 (La. 11/19/04), 888 So.2d 194.[2]

Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. Evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt. <u>State v. Murray</u>, 36,137 (La. App. 2 Cir. 8/29/02), 827 So.2d 488, 496, and cases cited therein. The Louisiana jurisprudence permits specific intent to kill or inflict great bodily harm to be inferred from the circumstances of the attack and the actions of the defendant. <u>Haggins v. Cain</u>, 2006 WL 1831529, *12 (W.D.La. 2006), citing <u>State v. Carney</u>, 319 So.2d 400, 402 (La. 1975) ("[T]he numerous stab wounds furnished adequate evidence of the requisite 'specific intent to kill or inflict great bodily harm ...' ").

---

[2] The second subsection of the second degree murder statute includes a killing without intent when the offender is engaged in enumerated felonies. Since the facts support a finding of second degree murder under the intent to kill or inflict great bodily harm portion of the statute, there is no need to discuss of the felony-murder subsection.

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20. The danger need not be real but the person attacked must reasonably believe that he is in actual danger and that it is necessary to kill in order to save himself. A person's belief that he is in danger of losing his life or receiving serous personal injury is not "reasonable" unless it is founded upon an actual a physical attack or hostile demonstration by the deceased. Factors which should be considered in determining whether the defendant had a reasonable belief that the killing was necessary are the possibility of avoiding the necessity of taking human life by retreat, the excitement and confusion of the occasion, the possibility of avoiding the necessity of killing by using force or violence less than killing, and the party's knowledge of the assailant's bad character. La. R.S. 14:20, Reporter's Comment and cases cited therein. Also, State v. Brown, 640 So.2d 488, 492-93 (La. App. 3d Cir. 1994). An aggressor or one who brings on difficulty, as a general rule, cannot claim the right of self-defense unless he withdraws from the conflict in good faith and indicates his intention of abandoning the difficulty. La. R.S. 14:21. Where doubt exists as to whether the accused was the aggressor, the possibility of retreat is only one of many factors

for the jury to consider in determining whether the defendant has a reasonable belief that the force employed was necessary.  Brown, 640 So.2d at 492.

A defendant who has been charged and is on trial for homicide and asserts that he acted in self-defense does not assume any burden of proof whatever on that issue; the state has the entire and affirmative burden of proving beyond a reasonable doubt that the homicide was not justifiable under the particular circumstances.  State v. Pittman, 428 So.2d 979 (La. App. 1st Cir.), writ den., 433 So.2d 155 (La.), cert. den., 464 U.S. 836, 104 S.Ct. 122 (1983), and cases cited therein.  On review, the relevant inquiry is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense.  State v. Matthews, 464 So.2d 298 (La. 1985).

In the case at bar, Martin testified that Miller entered her apartment with a knife in his hand, fought with Rose, and chased Martin and attacked (Tr. pp. 488-491).  Medical and forensic evidence established that both Martin and Rose had multiple slash and stab wounds to the backs of their bodies as well as the fronts (Tr. pp. 379-394, 490-491), but that Miller had only two small wounds to the hand which apparently held the knife (Tr. pp. 579).  Even assuming Miller was acting in self-defense, it is apparent

13

that the lethal force employed by Miller was excessive and unnecessary. Miller has failed to show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt of second degree murder and attempted second degree murder.

Miller also claims he should only have been found guilty of manslaughter and attempted manslaughter since he acted in "sudden passion" and "heat of blood."

It is the presence of "sudden passion" and "heat of blood" that distinguishes manslaughter from murder.[3] "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors. Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. State v. Jones, 2003-0829 (La.App. 4 Cir. 12/15/04), 891 So.2d 760, 772, writ den., 2005-0124 (La. 11/28/05), 916 So.2d 140, and cases cited

---

[3] La.R.S. 14:31 states in pertinent part, "A. Manslaughter is: (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or...".

therein.

In reviewing a claim that the defendant acted in "sudden passion" or "heat of blood", the habeas court must determine whether, viewing the evidence in the light most favorable to the conviction, a rational trier of fact could have found those mitigating factors were not established by a preponderance of the evidence. See <u>State v. Overton</u>, 596 So.2d 1344, 1359 (La. App. 1st Cir.), writ den., 599 So.2d 315 (La. 1992), and cases cited therein; <u>State v. Brumfield</u>, 639 So.2d 312, 317 (La. App. 4th Cir. 1994), citing <u>State v. Lombard</u>, 486 So.2d 106, 111 (La. 1986); <u>Cupit v. Whitley</u>, 28 F.3d 532, 542 (5th Cir. 1994), cert. den., 513 U.S. 1163, 115 S.Ct. 1128 (1995).

In the case at bar, Miller apparently claims manslaughter convictions would have been more appropriate because he attacked Martin and Rose after Martin slapped him several times. However, the jury apparently concluded that being slapped by Martin is not provocation sufficient to cause an average person to lose his self-control and cause him to commit a homicide. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the factors of "sudden passion" or "heat of blood" were not established, particularly in view of the fact that Miller arrived at Martin's apartment armed with a knife, as testified to by Martin and admitted by Miller.

This ground for relief is meritless.

Ground No. 2 - Other Crimes Evidence

Next, Miller claims the trial judge erred in allowing the introduction of other crimes evidence in violation of the Fourteenth Amendment. Miller is referring to testimony that Miller escaped from jail while awaiting trial in the instant case.

Mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief. Panzavecchia v. Wainwright, 658 F.2d 337, 340 (5th Cir. 1981). Thus, claims challenging the exclusion or inclusion of evidence based on state law do not afford a basis for federal habeas corpus relief. Federal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law. In reviewing state court evidentiary rulings, the federal habeas court's role is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness under the Due Process Clause. Castillo v. Johnson, 141 F.3d 218, 222 (5th Cir.), cert. denied 524 U.S. 979, 119 S.Ct. 28 (1998), and cases cited therein.

The admission of improper evidence in a state criminal trial will constitute grounds for habeas relief if fundamental fairness was prevented thereby. What elevates the mistake to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant

factor. Second, it must have some state complicity in it. <u>Shaw v. Estelle</u>, 686 F.2d 273, 275 (5th Cir. 1982), cert. den., 459 U.S. 1215, 103 S.Ct. 1215, 75 L.Ed.2d 453 (1983), and cases cited therein. Also, <u>Hills v. Henderson</u>, 529 F.2d 397 (5th Cir. 1976), cert. den., 429 U.S. 850, 97 S.Ct. 139 (1976).

Louisiana law generally prohibits the admission of "other crimes evidence," that is, evidence of criminal conduct uncharged in the subject indictment, with exceptions for proving identity, system or res gestae. <u>Robinson v. Whitley</u>, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994), citing <u>State v. Prieur</u>, 277 So.2d 126, 128 (La. 1973). However, evidence of criminal acts of the accused designed to obstruct justice or avoid punishment for the present crime may be introduced as an admission by conduct, subject to the following safeguards: (1) before the evidence is introduced at all, there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; (2) the evidence of the accused's conduct must be substantially relevant to show his consciousness of guilt of the crime charged; (3) the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. <u>State v. Molinario</u>, 383 So.2d 345, 349 (La. 1980), cert. den., 449 U.S. 882, 101 S.Ct. 232 (1980).

Flight indicates a consciousness of guilt and is relevant evidence. <u>State v. Washington</u>, 430 So.2d 641, 648 (La. 1983), and

17

cases cited therein.    In <u>Molinario</u>, the Louisiana Supreme Court
stated,

> "Defendant had been released on bail and was awaiting
> trial at the time of his flight. This case does not
> present a situation where the inference of guilt drawn
> from the flight of the accused was clouded by other
> factors, such as unrelated pending criminal charges,
> prison conditions or the desire for freedom, or a lack of
> confidence in a right to a speedy trial. We conclude
> therefore that defendant's flight from the state was
> relevant to show his consciousness of guilt... and that
> the probative value of this evidence outweighed its
> prejudicial effect."

In <u>State v. Lee</u>, 381 So.2d 792, 794 (La. 1980), the court
distinguished the circumstances of Lee's escape, stating,

> "Defendant's flight, a momentary departure from a vehicle
> transporting him from jail to a hospital for treatment
> which occurred over six weeks after his arrest for armed
> robbery, was not significantly probative of his guilt,
> since it may have been motivated by many other reasons,
> such as prison or hospital conditions, a simple desire
> for freedom, or a lack of confidence in his right to a
> fair and speedy trial. Accordingly, while there was no
> question of defendant's attempted escape, consciousness
> of guilt of the crime charged reasonably could not be
> inferred from his flight, and the prejudicial effect of
> the evidence clearly outweighed its probative value."

In the case at bar, Miller testified he walked out of the jail
where he had been incarcerated pending trial, to which he pleaded
guilty to simple escape (Tr. p. 613).  Upon objection by Miller's
attorney, it was established that his co-counsel had represented
Miller in the criminal proceedings for the escape conviction, so
Miller's attorneys were aware of his escape conviction (Tr. p.
623).   The trial judge ruled the escape conviction could be

considered as evidence of consciousness of guilt (Tr. p. 623). Miller argues the evidence did not show the escape was closely associated in time and circumstance with the pending trial. However, Miller has not adduced any evidence to support show the escape was, in fact, due to some other reason. Even if the trial judge erred in admitting the evidence of his escape conviction, Miller has not carried his burden of proving the mistake was "crucial, critical, and highly significant" and that his trial was rendered "fundamentally unfair" by its admission, particularly in light of the weight of the other evidence introduced at trial. Although Miller contends this evidence affected his credibility before the jury, it is clear that Miller's inability to recall whether or not he had stabbed Martin and Rose affected his credibility far more than his subsequent escape from jail.

Therefore, this ground for relief is meritless.

## Ground No. 3 - Miller's Inculpatory Statement

Miller next contends the trial judge erred in failing to suppress his inculpatory statement, in violation of the Fourteenth Amendment. Miller's motion to suppress the statement was heard at trial and denied (Tr. p. Tr. pp. 349-372), since Miller's claims of being sleepy, tired, intimidated, fearful, and "in shock" (Doc. Item 1, Pet. Brief p. 28) were not a sufficient reason to suppress the statement under decisional case law (Tr. pp. 372-373).

Voluntariness depends on the totality of the circumstances and must be evaluated on a case by case basis under <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S.Ct. 515, 520-21 (1986). A confession is voluntary in the absence of official overreaching, in the form of either direct coercion or subtle forms of psychological persuasion. <u>U.S. v. Rojas-Martinez</u>, 968 F.2d 415, 418 (5th Cir.), cert. den., 506 U.S. 1039, 1059, 113 S.Ct. 828, 995 (1992). Also, <u>U.S. v. Raymer</u>, 876 F.2d 383, 386-87 (5th Cir.), cert. den., 493 U.S. 870, 110 S.Ct. 198 (1989); <u>Bell v. Lynaugh</u>, 663 F.Supp. 405, 413 (E.D.Tex.), aff'd, 828 F.2d 1085 (5th Cir.), cert. den., 484 U.S. 933, 108 S.Ct. 310 (1987). Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. <u>Penry v. Lynaugh</u>, 832 F.2d 915, 918 (5th Cir. 1987), rev'd in part on other grounds, 492 U.S. 302, 109 S.Ct. 2934 (1989), citing <u>Connelly</u>, 107 S.Ct. at 522. Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. <u>Connelly</u>, 107 S.Ct. at 524.

Miller testified at trial (during the hearing on the motion to suppress) that, at the time of his arrest, he was bleeding, tired, sleepy, had the flu, was shaking, and his blood pressure was up (Tr. p. 583). Miller testified he cooperated when the police arrested him at gun-point in Collinston, was handcuffed, taken to

the jail, strip-searched, and given jail clothes to wear; Miller testified he was "in shock" at the time (Tr. pp. 583-584).

Officer Mike Tubbs testified that he advised Miller of his rights by using a "Miranda form," Miller indicated he understood and wanted to waive his rights, he was not intimidated by anyone or promised anything, and he did not appear to be intoxicated (Tr. pp. 453-455). Officer Tubbs testified that Miller was questioned one to one and a half hours to an hour after he was arrested, Miller had indicated he had been up most of the night, and Miller's clothes had been taken into evidence and he had been given clean clothes to wear; when he finished making his recorded statement, Miller advised the officers that his head was hurting (Tr. pp. 457-459). Officer Chuck Wilson testified that Miller was advised of and waived his rights, he was not threatened or promised anything, he said he wanted to tell his side of the story and began his recorded statement at 8:05 a.m., and he was provided something to drink (Tr. pp. 460-465). Both officers acknowledged that Miller had been arrested at gunpoint, handcuffed and made to lie on the porch, and he had been made to change his clothes so his clothing could be taken into evidence (Tr. pp. 457-458, 464).

Miller has not alleged any facts indicating either direct government coercion or psychological persuasion which would indicate he was coerced by the government into giving his statement. Therefore, Miller has not stated a claim for violation

of his constitutional rights which would entitled him to habeas relief. This ground for relief is also meritless.

## Ground No. 5a - Plea

Miller contends defense counsel was ineffective when he filed a motion to amend Miller's plea from not guilty to "not guilty by reason of insanity," then (1) after the sanity hearing counsel failed to change the plea back to not guilty, and (2) during trial counsel failed to present insanity evidence.

To prevail on a habeas complaint of ineffective assistance of counsel a complainant must demonstrate that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. To make that determination the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. The court does not assess any alleged error in isolation. In an examination of state proceedings under 28 U.S.C. § 2254 the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence. Jones v. Cain,

227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein.

Miller is mistaken. Miller's counsel filed a motion to amend Miller's plea from not guilty to a dual plea of "not guilty and not guilty by reason of insanity." When Miller's claim of insanity was not supported by the sanity commission's report, the trial judge found him mentally competent both at the time of the offenses and at the time of trial. Therefore, Miller's insanity plea was tacitly dropped, leaving the alternate plea of "not guilty." The trial judge did not instruct the jury as to the law on an insanity defense (Tr. pp. 209-218), and "not guilty by reason of insanity" was not included on the jury verdict forms (Tr. pp. 219-220). Therefore, it was not necessary for Miller's attorney to file a motion to amend Miller's plea. Counsel is not required to engage in the filing of futile motions. Murray v. Maggio, 736 F.2d 279, 283 (5th Cir. 1984), citing William v. Beto, 354 F.2d 698, 703 (5th Cir.1965). Therefore, Miller's attorney did not need to change Miller's plea. Moreover, since the evidence from the court-appointed experts did not support Miller's insanity defense, Miller's attorney had no basis on which to introduce evidence of insanity at trial and did not give ineffective assistance in this respect..

Since Miller has not demonstrated ineffective assistance of counsel as to his plea, this ground for relief is meritless.

23

Ground No. 5c - Motion to Quash the Indictment

Finally, Miller contends his attorney was ineffective in failing to file a motion to quash the indictment due to disproportionate under-representation of black people on the Ouachita Parish Grand and Petit juries.

In order to establish a prima facie case of systematic exclusion of Blacks from grand and petit juries, plaintiffs have a twofold burden. First they must make a showing of marked disparity between the percentage of Blacks among persons putatively qualified to serve as jurors and the percentage of Blacks actually on the jury lists in the case in question. Second, plaintiffs must demonstrate that the discriminatory result in the jury list accompanied a system of jury selection permitting possible racial identification of potential jurors at any stage in the process of selection of the jury list. This second burden may also be discharged by showing that the discriminatory result in the jury list in a particular case was representative of the results obtained in a history of cases in the particular jurisdiction in which the trial occurred. No discriminatory intent need be demonstrated and the jury commissioners' good faith is of no relevance. Once a prima facie case has been established, the selecting officials have the burden of showing that permissible racially neutral selection criteria have produced the result. McGhee v. King, 518 F.2d 791, 792-793 (5th Cir. 1975), citing

24

Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221 (1972).
Also, U.S. v. Williams, 264 F.3d 561 (5th Cir. 2001).

In the case at bar, Miller's claim was raised at trial and denied for failure to raise it by pretrial motion. Where the defendant has failed to preserve his claim that his grand (or petit) jury was selected through a racially discriminatory process, he must show actual prejudice. Pickney v. Cain, 337 F.3d 542, 545 (5th Cir. 2003). Miller has not adduced any statistics or other evidence to establish the racial composition of the grand and petit jury venires to support his claims of racial discrimination and prove he had ineffective assistance of counsel. A habeas petitioner has the burden of proving facts in support of his claim. Unsupported conclusory allegations do not warrant habeas relief. Uresti v. Lynaugh, 821 F.2d 1099, 1103 (5th Cir. 1987); Wilson v. Butler, 813 F.2d 664, 671 (5th Cir.), on rehearing, 825 F.2d 879, 881 (5th Cir. 1987), cert. den., 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988); United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983), cert. den., 467 U.S. 1251 (1984); United States v. Jones, 614 F.2d 80, 82 (5th Cir.), cert. den., 446 U.S. 945 (1980). Therefore, Miller has not carried his burden of proving he had ineffective assistance of counsel.[4] Compare, State v. Nix, 327

---

[4] Moreover, even assuming that a motion to quash the indictment would have been successful, Miller has failed to show prejudice from his counsel's failure to do so. Given the nature and great weight of the State's evidence in this case, both physical and testimonial, as well as Miller's lack of memory as

So.2d 301 (La. 1975), cert. den., 425 U.S. 954, 96 S.Ct. 1732 (1976).

Since Miller has not carried his burden of showing he had ineffective assistance of counsel with regard to his counsel's failure to file pretrial motions raising claims of racial discrimination in Miller's grand and petit juries, this ground for relief is meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Miller's habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered

---

to the events, if counsel had filed a motion to quash the indictment, the State would have likely presented the case to a second grand jury and obtained a second indictment. Under these circumstances, the record supports the view that counsel's actions were the result of a sound strategic decision not to engage in futile motions. Compare, Pickney, 337 F.3d at 545; Brown v. Cain, 337 F.3d 546 (5th Cir. 2003). Also, Felton v. Barnett, 912 F.2d 92, 97 (4th Cir. 1990), cert. den., 498 U.S. 1032, 111 S.Ct. 693 (1991).

by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 17th day of October, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE